**Electronically Filed
Supreme Court
SCWC-13-0003857
29-JUN-2015
02:46 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

POFOLK AVIATION HAWAII, INC., and HALE OʻLELE CORP.,
Petitioners/Plaintiffs-Appellants,

vs.

DEPARTMENT OF TRANSPORTATION FOR THE STATE OF HAWAIʻI,
GLENN M. OKIMOTO, FORD FUCHIGAMI, and SIDNEY A. HAYAKAWA,
Respondents/Defendants-Appellees.

SCWC-13-0003857

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-13-0003857; CIV. NO. 13-1-0787-03)

JUNE 29, 2015

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case involves the validity of airport landing fees imposed by the Department of Transportation Airport Division (DOT-A). DOT-A leases Dillingham Airfield on the island of Oʻahu (Dillingham Airfield) from the United States Army. Since DOT-A

began leasing the airfield from the Army, DOT-A has imposed landing fees on commercial users, including Petitioners/ Plaintiffs-Appellants Pofolk Aviation Hawaiʻi, Inc., and Hale Oʻlele Corp. (collectively "Pofolk").

In late 2012, DOT-A claimed that Pofolk owed DOT-A a total of $264,994.99 in unpaid landing fees.  Pofolk paid a portion of this amount under protest.  Pofolk also filed a lawsuit and sought temporary and permanent injunctions preventing DOT-A from imposing additional fees against Pofolk, and a declaration that an administrative rule of DOT-A was invalid to the extent it established the rate of landing fees at the airfield.  Specifically, Pofolk claimed that DOT-A had violated Hawaiʻi Revised Statutes (HRS) § 261-12(a), which provided that "[n]o rule of the director [of transportation] shall apply to airports . . . owned or operated by the United States."  The circuit court denied Pofolk's request for injunctive relief and entered a final judgment on the merits in favor of DOT-A, and the Intermediate Court of Appeals (ICA) affirmed.  For the reasons set forth below, the judgment of the ICA is affirmed, as clarified herein.

## I.  Background[1]

### A.  Dillingham Airfield

Dillingham Airfield is used primarily for commercial glider, sky diving, and flight training operations.  DOT-A has

---

[1]     The facts are undisputed except where stated otherwise.

operated Dillingham Airfield under a lease from the United States
Army (Army Lease) continually since 1983.  Clause 32 of the Army
Lease, titled "Additional Site Conditions," provides, in relevant
parts:

> b.  That the lessee's use of Dillingham Airfield shall
> be limited to the construction, operation, repair, and
> maintenance of a public airport facility . . . .
>
> c.  That the use of Dillingham Airfield is subject to
> the following operational provisions:
>
> (I) That the primary purpose of the land and
> improvements within the leased area is for the
> operation of a joint-use-airport.
> . . . .

DOT-A imposes fees on users of Dillingham Airfield,
including Pofolk.

Two statutes at the heart of this dispute, HRS §§ 261-
12(a) and 261-7(e), set forth the scope of DOT-A's authority to
impose such fees.

At all times pertinent to the instant dispute, HRS
§ 261-12(a) (2007) provided:

> Powers to adopt.  The director of transportation may
> perform such acts, issue and amend such orders, adopt
> such reasonable general or special rules and
> procedures, . . . as the director deems necessary to
> carry out this chapter and to perform the duties
> assigned thereunder, all commensurate with and for the
> purpose of protecting and insuring the general public
> interest and safety, the safety of persons operating,
> using, or traveling in aircraft, and the safety of
> persons and property on land or water, and developing
> and promoting aeronautics in the State.  No rule of
> the director shall apply to airports or air navigation
> facilities owned or operated by the United States.

(Emphasis added).[2]

HRS § 261-7(e) (Supp. 2013) provides, in relevant parts:

> The department may fix and regulate, from time to time, reasonable landing fees for aircraft, including the imposition of landing surcharges or differential landing fees, and other reasonable charges for the use and enjoyment of the airports and the services and facilities furnished by the department in connection therewith, including the establishment of a statewide system of airports landing fees . . . for the purpose of meeting the expenditures of the statewide system of airports . . . .
>
> . . .
>
> If the director has not entered into contracts, leases, licenses, and other agreements with any or fewer than all of the aeronautical users of the statewide system of airports prior to the expiration of an existing contract, lease, license, or agreement, the director shall set and impose rates, rentals, fees, and charges pursuant to this subsection without regard to the requirements of chapter 91; provided that a public informational hearing shall be held on the rates, rentals, fees, and charges. . . .
>
> The director shall develop rates, rentals, fees, and charges in accordance with a residual methodology so that the statewide system of airports shall be, and always remain, self sustaining. . . .

(Emphasis added).

DOT-A imposes fees on users of Dillingham Airfield through DOT-A Procedure 4.5.04 § E, which provides, in relevant part:

---

[2]     On July 1, 2015, an amendment to HRS § 261-12(a) will take effect. The amendment repeals the last sentence, which states, "[n]o rule of the director shall apply to airports or air navigation facilities owned or operated by the United States."  Act 024 (May 4, 2015).  However, we apply the 2007 version of the statute to the instant dispute.

> Any aircraft operator who is not a party to an
> Airport-Airline Lease, landing at a state airport
> shall pay airports system fees and charges as
> established by Hawaiʻi Administrative Rules of the
> Department of Transportation.

Although this procedure directs airport users to pay fees for landing, the rates of such fees are specified in HAR § 19-16.1-3, which has been adopted pursuant to chapter 91:

> There shall be imposed an airports system landing fee
> under this chapter for the purpose of recovering costs
> attributable to the airfield activity center; this fee
> shall be based on landings at an airport in the
> airports system.  The airports system landing fee for
> an overseas landing at an airport in the airports
> system shall be $2.980 per one thousand pounds of
> approved maximum landed weight.  The airports system
> landing fee for an interisland landing at an airport
> in the airports system shall be $0.954 per one
> thousand pounds of approved maximum landed weight.

## B.    Pofolk's Unpaid Landing Fees

Pofolk is a Hawaiʻi corporation whose commercial sky diving and parachuting operations are based out of Dillingham Airfield.  Pofolk is a "non-signatory carrier," i.e., it is not party to an Airport-Airline Lease that specifies rates and fees for its activities at Dillingham Airfield.  In late 2012, a dispute arose between DOT-A and Pofolk over Pofolk's unpaid landing fees.

By letter dated December 17, 2012, Pofolk, through counsel, agreed to file all required reports and pay all past and future landing fees that were lawfully owed subject to an agreement that the fees would be paid under protest.  Pofolk also stated that if DOT-A would resolve Pofolk's outstanding permit

issues, allow it to construct a hangar at Dillingham Airfield, and allow it to use Hana Airport, Pofolk would continue paying the landing fees and not pursue litigation.

In a letter dated February 20, 2013, DOT-A claimed that Pofolk had not reported any landings since the end of November 2012.  DOT-A also informed Pofolk that it owed DOT-A a total of $264,994.99, and demanded payment for the full amount owed.

On February 28, 2013, Pofolk sent $50,837.99 "as partial payment for the disputed landing fees."  Pofolk stated that the payment was being made "under protest and without prejudice to [Pofolk's] contentions that [it] is exempt and should not be required to pay any amount of landing fees."

## C.   Circuit Court Proceedings

On March 14, 2013, Pofolk filed a complaint in the Circuit Court of the First Circuit of Hawaiʻi (circuit court) against DOT-A.[3]  Pofolk prayed for the following relief:  (1) the return of landing fees of $50,837.99 paid under protest, and interest on that sum; (2) a declaration that HAR § 19-16.1-3 is invalid to the extent that DOT-A seeks to impose landing fees for flights landing at Dillingham Airfield, because such fees conflict with DOT-A's limited statutory authority in HRS § 261-12(a) to promulgate and enact rules, and that Pofolk has been and

---

[3]     Pofolk named as defendants in their official capacities Glenn M. Okimoto, the Director of DOT, Ford Fuchigami, the Deputy Director of DOT-A, and Sidney A. Hayakawa, the Staff Services Branch Administrative Officer for DOT-A.

is exempt from all such landing fees; and (3) injunctive relief preventing and prohibiting DOT-A from imposing any further landing fees against Pofolk and/or taking further actions to coerce Pofolk to pay these fees, including, but not limited to, evicting Pofolk from Dillingham Airfield.

On April 8, 2013, DOT-A filed an answer and counterclaim, alleging that the imposition of landing fees is lawful and authorized by DOT-A procedure, and Pofolk's landing fees are immediately due. Also on April 8, 2013, Pofolk moved for a preliminary and permanent injunction to prevent DOT-A from imposing "illegal and unauthorized" landing fees for landings at Dillingham Airfield and/or taking any actions to collect, enforce, or otherwise execute upon any such purportedly outstanding fees.

On May 9, 2013, at the conclusion of a hearing on Pofolk's motion for preliminary and permanent injunctions, the circuit court[4] orally concluded that Pofolk had not shown any irreparable injury because it could be compensated financially (i.e., it could cover the fees through charging customers to their commercial sky diving operation, or recover them later from DOT-A), and that the public interest weighed in favor of not granting an injunction because the public would be better served by having the airfield available, and taxpayers would be burdened if DOT-A could not collect landing fees.

---

[4]     The Honorable Edwin C. Nacino presided.

On August 1, 2013, the circuit court entered an order denying Pofolk's motion.  The circuit court concluded that pursuant to HRS § 261-7(e), which authorizes DOT-A to impose fees "without regard to the requirements of chapter 91," DOT-A is not required to establish landing fees through the HAR rule-making process.  The circuit court also concluded that DOT-A's "requirement for aeronautical users . . . to pay landing fees at Dillingham Airfield is established by . . . DOT-A's procedures," and as such, although the rates of the fee are determined by reference to the HAR, DOT-A has the power to impose landing fees through its procedures.

Pursuant to a stipulation and order of the parties approved by the trial court on September 20, 2013, the trial court entered an order on September 23, 2013:  (1) ruling that the hearing already held shall be considered a hearing on the merits of Pofolk's cause of action for a permanent injunction, and based on the reasoning of the August 1, 2013 Order, Pofolk's claim for a permanent injunction was denied; and (2) dismissing all other claims, counterclaims, and defenses of the parties without prejudice.[5]  Accordingly, on September 23, 2013, the trial court entered judgment for DOT-A denying Pofolk's claims for relief.

---

[5]    Because the trial court entered final judgment on the merits based on stipulation of the parties that the circuit court's hearing would be considered a consolidated trial on the merits, on certiorari, we do not address Pofolk's claim for temporary injunctive relief; rather, we decide this case on the merits.

## D.  ICA Proceedings

On October 24, 2014, the ICA affirmed the circuit court's denial of Pofolk's motion for temporary and permanent injunctions.  <u>Pofolk Aviation Hawaiʻi, Inc. v. Dep't of Transp.</u> <u>for the State of Hawaiʻi</u>, 134 Hawaiʻi 255, 339 P.3d 1056 (App. 2014).  The ICA relied almost exclusively on DOT-A's construction of HRS § 261-12(a):

> In the instant case, the DOT's employee, Hayakawa, declared HRS § 261-12(a) empowered the DOT to "adopt such reasonable general or special rules and procedures . . . as the director deems necessary to carry out this chapter and to perform duties assigned thereunder[.]"  Hayakawa represented that at Dillingham Airfield, revenues generated from landing fees and other charges from aircraft operators, pursuant to the DOT procedures, are part of a calculation of rates and fees in compliance "with the statutory mandate that the statewide system of airports be financially self-sustaining."[]
>
> The DOT interpreted the limitation of HRS § 261-12(a) (2007 Repl.) on the DOT's authority to apply its rules to a federally owned airport as inapposite to DOT's authority to impose landing fees at Dillingham Airfield pursuant to the DOT procedures.  Hayakawa declared the DOT had established its written procedures "[s]eparate and apart from creating rules pursuant to [HRS] Chapter 91" and HRS § 261-12 "has never been interpreted by [the DOT] as prohibiting [the DOT] from operating it as a state airport facility, collecting fees, charges and rents imposed by its Procedures. . . ."
>
> In assessing the DOT's construction of HRS § 261-12(a), we note that "[a]lthough not controlling, the uniform practical construction of a statute by those charged with carrying out the statute is entitled to much weight."  <u>Chun v. Employees' Ret.</u> <u>Sys.</u>, 61 Haw. 596, 602, 607 P.2d 415, 419 (1980) (citing <u>Keller v. Thompson</u>, 56 Haw. 183, 532 P.2d 664 (1975); <u>Territory v. Honolulu Rapid Transit & Land</u> <u>Co.</u>, 23 Haw. 387 (1916)); <u>see also</u> <u>Fratinardo v.</u> <u>Employees' Ret. Sys. of State of Hawaiʻi</u>, 129 Hawaiʻi

-9-

107, 115-16, 295 P.3d 977, 985-86 (App. 2013).

Our assessment of the DOT's practices is further informed by Hayakawa's declarations that the DOT "has always exercised control" over Dillingham Airfield operations, users, and tenants; its users "regularly paid the assessed landing fees[;]" and "[t]his litigation is the first time Plaintiffs, or anyone else has claimed that they are not obligated to pay such fees because the Airfield is owned by the federal government." Hayakawa's declaration constituted evidence of the DOT's consistent and generally unchallenged practice of assessing landing fees and charges against users of Dillingham Airfield. Hawaiʻi courts will not overturn administrative agency practices that have been

> consistent and generally unchallenged
> . . . except for very cogent reasons if
> the scope of the command is indefinite and
> doubtful. . . . The practice has peculiar
> weight when it involves a contemporaneous
> construction of a statute by the men
> charged with the responsibility of setting
> its machinery in motion, of making the
> parts work efficiently and smoothly while
> they are yet untried and new.

Treloar v. Swinerton & Walberg Co., 65 Haw. 415, 424, 653 P.2d 420, 426 (1982) (quoting Norwegian Nitrogen Products Co. v. U.S., 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933)).

According much weight to the DOT's construction of HRS § 261-12(a) and in light of their consistent practice of assessing landing fees at Dillingham Airfield, we conclude Plaintiffs' contention does not establish the DOT's interpretation was palpably erroneous and the circuit court did not err by determining that the DOT's assessment of landing fees at Dillingham Airfield against Plaintiffs did not constitute a violation of HRS § 261-12(a)'s prohibition against applying the DOT "rules" to federally owned or operated airports.

134 Hawaiʻi at 262-63, 339 P.3d at 1063-64 (footnote omitted

noting DOT-A's reference to and quoting HRS § 261-7(e)).

## II.  Standard of Review

Hawaiʻi appellate courts

generally review[] questions of statutory interpretation de novo, but, in the case of ambiguous statutory language, the applicable standard of review regarding an agency's interpretation of its own governing statute requires this court to defer to the agency's expertise and to follow the agency's construction of the statute unless that construction is palpably erroneous.

Gillan v. Gov't Emps. Ins. Co., 119 Hawaiʻi 109, 114, 194 P.3d 1071, 1076 (2008) (internal quotations and citation marks omitted).

When interpreting two different statutes that relate to the same subject matter, this court has adopted the following standards:

First, legislative enactments are presumptively valid and should be interpreted in such a manner as to give them effect.  Second, laws in pari materia, or upon the same subject matter, shall be construed with reference to each other.  What is clear in one statute may be called in aid to explain what is doubtful in another.  Third, where there is a plainly irreconcilable conflict between a general and a specific statute concerning the same subject matter, the specific will be favored.  However, where the statutes simply overlap in their application, effect will be given to both if possible, as repeal by implication is disfavored.

Id. (alterations, quotation marks, and citations omitted).

### III.  Discussion

On certiorari, Pofolk presents the following question:

Whether the ICA erred in stretching HRS § 261-12(a) beyond its plain meaning in concluding that the DOT-A's setting and imposition of landing fees at Dillingham Airfield, which is owned by the United

-11-

> States, <u>does not</u> constitute a violation of HRS § 261-12(a).

(Emphasis in original).

Thus, we must determine whether the last sentence of HRS § 261-12(a), which states, "[n]o rule of the director shall apply to airports or air navigation facilities owned or operated by the United States," precludes DOT-A from setting and imposing landing fees at Dillingham Airfield through a DOT-A procedure that references the HAR for the landing fee rates. We conclude that DOT-A's authority to impose landing fees by reference to HAR § 19-16.1-3 does not conflict with HRS § 261-12(a).

Pofolk explicitly acknowledges that DOT-A has the authority to impose landing fees at Dillingham Airfield. Based on HRS §§ 261-12(a) and 261-7(e), we agree. HRS § 261-12(a) provides:

> The director of transportation may perform such acts, issue and amend such orders, adopt such reasonable general or special rules and procedures, and establish such minimum standards, consistent with this chapter, as the director deems necessary to carry out this chapter and to perform the duties assigned thereunder, all commensurate with and for the purpose of protecting and insuring the general public interest and safety, the safety of persons operating, using, or traveling in aircraft, and the safety of persons and property on land or water, and developing and promoting aeronautics in the State. <u>No rule of the director shall apply to airports or air navigation facilities owned or operated by the United States.</u>

(Emphasis added).

HRS § 261-7(e) (Supp. 2013) provides, "the director shall set and impose rates, rentals, fees, and charges pursuant

to this subsection without regard to the requirements of chapter 91." Thus, HRS § 261-7(e) grants DOT-A the authority to impose landing fees without following the rule-making requirements of HRS chapter 91.

Pofolk argues that the reference in DOT-A Procedure 4.5.04 § E to "fees and charges as established by Hawaiʻi Administrative Rules of [DOT-A]" constitutes an application of a 'rule of the director' to an airport 'owned or operated by the United States,' in violation of the last sentence of HRS § 261-12(a). Pofolk argues that DOT-A must impose the landing fees "without reference to rules adopted by the DOT pursuant to chapter 91."

Pofolk further argues that HRS § 261-7(e) and HRS § 261-12(a), as laws on the same subject matter, should be construed together, and that because there is a "plainly irreconcilable conflict," the more specific statute, HRS § 261-7(e), should be favored over the more general statute, HRS § 261-12(a). Thus, according to Pofolk, when considered in pari materia, HRS § 261-7(e) and HRS § 261-12(a) authorize and require DOT-A to establish landing fees, and further require DOT-A to do so "without reference to rules" adopted pursuant to chapter 91.

However, HRS § 261-7(e) does not provide that DOT-A shall impose landing fees "without reference to rules" adopted by DOT-A pursuant to chapter 91; rather, the statute provides that DOT shall impose landing fees "without regard to the requirements

-13-

of chapter 91." (Emphasis added). Thus, DOT-A does not need to satisfy the rule-making requirements in chapter 91 when imposing landing fees.

Nevertheless, Pofolk's claim does reveal an ambiguity. The reference to "rules" in HRS § 261-12(a) is ambiguous because a DOT-A procedure that requires aircraft operators to pay the fees does not directly set forth the landing fee rates; rather, it refers to a rule which sets forth the rates. Thus, it is unclear whether a DOT-A procedure incorporating by reference a rule setting landing fee rates equates to a "rule" under HRS § 261-12(a).

"Statutory analysis begins by examining the plain language of the statute at issue." Chung Mi Ahn v. Libery Mut. Fire Ins. Co., 126 Hawaiʻi 1, 11, 265 P.3d 470, 480 (2011) (citations omitted). "When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists." Gillan, 119 Hawaiʻi at 117, 194 P.3d at 1079 (quotation marks and citations omitted). "[I]n construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." Kewalo Ocean Activities v. Ching, 124 Hawaiʻi 313, 317, 243 P.3d 273, 277 (2010).

Furthermore, "[d]eparture from the literal construction of a statute is justified if such a construction yields an absurd and unjust result obviously inconsistent with the purposes and policies of the statute." Schmidt v. HSC, Inc., 131 Hawaiʻi 497, 508, 379 P.3d 416, 427 (2014) (internal quotation marks and citation omitted).

According to DOT-A's interpretation, HRS § 261-12(a) does not prohibit DOT-A from imposing landing fees at Dillingham Airfield because fees are imposed through DOT-A procedure, not a rule. DOT-A argues that HAR § 19-16.1-3, an administrative rule, merely specifies the landing fee rate, but does not provide the authority to actually impose the fee.[6]

The ICA, "[a]ccording much weight to the DOT's construction of HRS § 261-12(a) and in light of [DOT-A's] consistent practice of assessing landing fees at Dillingham Airfield," concluded that DOT-A's interpretation of HRS § 261-12(a) is not palpably erroneous. Thus, the ICA concluded that the statute does not negate DOT-A's authority to impose fees under HRS § 261-7(e). In doing so, the ICA quoted Chun v. Employees' Retirement System, 61 Haw. 596, 602, 607 P.2d 415, 419 (1980), which states, "[a]lthough not controlling, the uniform

_____

[6] DOT-A also argues that the word "or" in the last sentence of HRS § 261-12(a) should be read as "and" pursuant to HRS § 1-18. HRS § 1-18 provides that "[e]ach of the terms 'or' and 'and', has the meaning of the other or of both." Under this reading, the last sentence of HRS § 261-12(a) would read, "[n]o rule of the director shall apply to airports or air navigation facilities owned and operated by the United States." (Emphasis added). However, because this is an alternative argument, we do not address it here.

practical construction of a statute by those charged with carrying out the statute is entitled to much weight."

While we agree with the ICA that the administrative agency's interpretation is entitled to deference when we construe an ambiguous statute that the agency is charged with administering, nevertheless, we emphasize that the court must still independently analyze the ambiguous statute to determine whether the agency's interpretation is palpably erroneous. See Chun, 61 Haw. at 600-02, 607 P.2d at 419 (the court first analyzes the plain language of the statute, and then notes that "our reading of the statute is also consistent with past administrative practice of the" agency) (emphasis added) (citations omitted).

A comparison of HRS § 261-12(a) and HRS § 261-7(e) and their apparent underlying policies, as well as a consideration of the provisions in chapter 261 as a whole, and the legislative history of HRS § 261-12(a), indicates that the legislature did not intend for DOT-A to be precluded from setting landing fees at Dillingham Airfield by referring to the rates set forth in the HAR.

HRS § 261-12 provides DOT-A with general rule-making authority. DOT-A may adopt rules "commensurate with and for the purpose of protecting and insuring the general public interest and safety, the safety of persons operating, using, or traveling in aircraft, and the safety of persons and property on land or

-16-

water, and developing and promoting aeronautics in the State."
HRS § 261-12(a). HRS § 261-12 does not mention rules relating to
imposing or setting the rate of landing fees.

Indeed, there is also no mention whatsoever of "rules"
in HRS § 261-7(e)'s grant of authority for DOT-A to impose
landing fees. There is also no prohibition in HRS § 261-7(e)
against imposing the landing fees at airports owned or operated
by the United States. As the statute itself explains, the
purpose behind granting DOT-A the authority to impose landing
fees and other fees and charges is so that the "statewide system
of airports" is "self-sustaining." HRS § 261-7(e). Thus, DOT-A
is granted the authority to set fees, and to do so at a rate such
that the fees are "at least sufficient to meet the expenditures
of the statewide system of airports." Id. This is consistent
with the policy behind chapter 261 and the public interest in
having DOT-A "encourage, foster, and assist in the development of
aeronautics in the State and encourage the establishment of
airports and air navigation facilities." HRS § 261-2 (2007).
Consistent with and pursuant to this authority, DOT-A has
established a procedure that imposes landing fees on certain
users, which are not party to an Airport-Airline Lease, including
Pofolk. See DOT-A Procedure 4.5.04 § E.

Furthermore, Pofolk's literal interpretation would
produce an absurd result that is inconsistent with the purposes
and policies of chapter 261. See Schmidt, 131 Hawaiʻi at 508,

379 P.3d at 427.  Under Pofolk's interpretation of HRS §§ 261-7(e) and 261-12(a), DOT-A is authorized to set landing fees pursuant to HRS § 261-7(e) without meeting the rule-making requirements of chapter 91, provided that a public hearing is held, but if DOT-A follows the more stringent chapter 91 requirements and the landing fees are set forth in the HAR, then those landing fees are invalid as applied to Dillingham Airfield.[7]  It would be nonsensical to interpret the statutes as stating that the exact same landing fee rates would be valid if set forth in DOT-A's procedures, but here they are invalid because DOT-A provided more notice and a greater opportunity for public input by setting the rates in accordance with chapter 91.

Pofolk's interpretation would also be inconsistent with the policies behind chapter 261.  HRS § 261-2 provides, "[t]he department of transportation shall have general supervision over aeronautics within the State.  It shall encourage, foster, and assist in the development of aeronautics in the State and encourage the establishment of airports and air navigation facilities."  This language indicates a broad intent to allow DOT-A to have general control over aeronautics.

Moreover, in considering DOT-A's broad general rule-making authority under chapter 261, together with the stated

---

[7]     Pofolk concedes that the imposition of landing fees would not violate HRS § 261-12(a) if the language in the HAR establishing the landing rates had simply been "cut and pasted" into the procedure.  See Oral Argument at 8:10; 14:30, Pofolk Aviation Hawaiʻi, Inc. v. Dep't of Transp. of the State of Hawaiʻi, No. SCWC-13-0003857, available at http://state.hi.us/jud/oa/15/SCOA_021915_3857.mp3.

intent in HRS § 261-2 that DOT-A "encourage, foster, and assist in the development of aeronautics in the State and encourage the establishment of airports and air navigation facilities," it is apparent that the legislature intended to authorize DOT-A to set and impose landing fees.

For example, chapter 261 authorizes DOT-A to adopt rules regarding, among other things, safety, welfare, aircraft registration, air traffic, airport security, equipment, and motor vehicles on the premises. HRS § 261-13.5 (2007);[8] HRS § 261-15.5 (2007);[9] HRS § 261-12(b).[10] The autority given to DOT-A in these

---

[8]     HRS § 261-13.5(b) provides, in pertinent parts:

> To the fullest extent possible within the State's authority to act in the area of airport and air traffic safety, the department of transportation shall be responsible for promoting safe operating conditions and alleviating safety hazards due to air traffic congestion at airports under its control.
>
> . . . .
>
> Pursuant to sections 261-12 and 261-13, the director shall adopt such rules and standards which may include the assignment of particular runways for particular uses, the establishment of the number and types of aircraft allowed to use each public airport, and the use of similar measures where such actions may contribute to the segregation of different types of aircraft and to the reduction of peak air traffic usage at airports under state control.

(Emphasis added).

[9]     HRS § 261-15.5 provides, in pertinent part:  "Unless an aircraft is exempted by this section, no person shall operate or cause or authorize to be operated any aircraft at an airport owned or controlled by the department, unless the aircraft has a certificate of registration issued in accordance with rules adopted by the department."  (Emphasis added).

[10]HRS § 261-12(b) provides, in pertinent part:  "[N]o tour aircraft operation shall be permitted in any airport under the State's control without having a permit.  The director shall adopt rules to regulate tour aircraft operations by permit . . . ."  (Emphasis added).

statutes to adopt rules at airports <u>under DOT-A's control</u> assists in aeronautic development by promoting safety and efficiency.[11] Similarly, DOT-A's authority to impose landing fees also supports aeronautic development because the landing fees keep the statewide airport system self-sustaining.

As Pofolk acknowledges, the authority granted by HRS § 261-7(e) to impose landing fees to make the statewide system of airports self-sustaining includes imposing landing fees at Dillingham Airfield. Pofolk's interpretation of HRS § 261-12(a), however, would restrain options for making the statewide system of airports self-sustaining, and is inconsistent with state aeronautic development, a goal of DOT-A in HRS § 261-2.

Furthermore, one apparent rationale of the last sentence of HRS § 261-12(a) is to prevent state operational rules from interfering with federal aeronautic operations. The final sentence in HRS § 261-12(a) originates in Section 13 of Act 32, "An Act Relating to Aeronautics . . ." (Act 32), which was enacted in 1947 by the Legislature of the Territory of Hawaiʻi.[12]

---

[11]     We note also that Pofolk's literal interpretation of the last sentence of HRS § 261-12(a) would create a clear conflict between HRS § 261-12(a) and (b). Subsection (a) provides that "[n]o <u>rule</u> of the director shall apply to airports or air navigation facilities owned or operated by the United States," but subsection (b) grants authority to DOT-A to "adopt <u>rules</u> to regulate tour aircraft operations by permit" "in <u>any airport under the State's control</u>." (Emphases added).

[12]     Act 32 provided, in pertinent part:

> The commission may perform such acts, issue and amend such orders, make promulgate, and amend such reasonable general or special rules, regulations and procedures and establish such minimum standards,

(continued...)

The act expressly declared that "all territorial airports and air navigation facilities <u>except those under military jurisdiction and control</u>" fell under the jurisdiction and control of the newly created territorial aeronautics commission.  1947 Haw. Sess. Laws Act 32 § 2 at 166 (emphasis added).  Act 32 further stated that "by purchase, gift, devise, lease, [or] condemnation[,] . . . [t]he commission is authorized to acquire rights and interests in airports owned or controlled by others, for the purpose of meeting a civilian need," and "may <u>fix and regulate</u> . . . reasonable landing fees . . . for the use and enjoyment of the airports and the services and facilities furnished by the commission . . . ."  <u>Id.</u> § 6(a) at 170; <u>id.</u> § 8(c) at 172 (emphasis added).

Thus, through Act 32, the legislature intended to make users of an airport leased to and operated by the commission--but owned by the United States--subject to reasonable landing fees "fix[ed] and regulate[d]" by the commission.  Moreover, because Dillingham Airfield is leased to DOT-A under a lease that allows

---

[12](...continued)
consistent with the provisions of this chapter, as it shall deem necessary to carry out the provisions of this chapter and to perform its duties hereunder:  all commensurate with and for the purpose of protecting and insuring the general public interest and safety, the safety of persons operating, using or traveling in aircraft, and the safety of persons and property on land or water, and developing and promoting aeronautics in the Territory.  No rule or regulation of the commission shall apply to airports or air navigation facilities owned or operated by the United States.

1947 Haw. Sess. Laws Act 32, § 13(a) at 174.

DOT-A to control and operate Dillingham Airfield as a public airfield for commercial skydiving and parachuting activities, and DOT-A is not attempting to impose its rules or fees on any federal operations, any concern about state operational rules interfering with federal operations is not implicated here.

In sum, as Pofolk acknowledges, DOT-A has the authority to impose and set landing fees at Dillingham Airfield. HRS § 261-12(a) does not preclude DOT-A from doing so through its procedures, which DOT-A may adopt through less stringent requirements than rules under chapter 91. It would be inconsistent with the policy behind HRS § 261-7(e) to permit DOT-A to impose landing fees at Dillingham Airfield pursuant to a procedure and yet invalidate the procedure just because it refers to the HAR for a method of calculating the fee. Accordingly, it is not reasonable to presume that the legislature intended for DOT-A to be precluded from referring to the HAR for the specific rates of the landing fees.

### IV. Conclusion

The ICA's November 21, 2014 judgment on appeal is affirmed, as clarified by this opinion.

Eric A. Seitz
for petitioners

Jack A. Rosenzweig
for respondents

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson



-22-